IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IUE-CWA, et al., ) | |
| ) | Case No. 4:15-cv-02301 |
| Plaintiffs, ) | |
| ) | Judge Benita Y. Pearson |
| v. ) | |
| ) | |
| General Electric Company, ) | |
| ) | |
| Defendant. ) | |

**Memorandum of Points and Authorities in Support of
<u>Defendant's Motion to Transfer Venue</u>**

Plaintiffs are a group of unions and a number of individuals seeking to represent a putative class of certain people who were previously represented by those unions. Plaintiffs have sued Defendant, General Electric Company ("GE"), to contest changes made by GE to certain welfare health benefits that it provides to its retirees as a supplement to the coverage provided by Medicare. Plaintiffs allege that GE's existing retirees who were previously represented by one of the unions have a vested lifetime right to the Medicare-supplement retiree benefits provided under prior benefit plans and collective bargaining agreements ("CBAs"), notwithstanding that those CBAs have expired and those benefit plans contained express reservations of GE's right to amend or terminate them. For the following reasons, this lawsuit should be transferred to the U.S. District Court for the Northern District of New York.

*First*, the case has no real factual relationship to the Northern District of Ohio, much less to the Youngstown sub-division. GE is a New York corporation, and it administered the benefit plans at issue at its principal place of business in New York—namely, Schenectady, which is located in the Northern District of New York. Moreover, all of the numerous CBAs at issue were negotiated in New York over a period of forty-plus years, and the lead union negotiator, Plaintiff IUE-CWA GE and Aerospace Conference Board ("IUE GE Conference Board"), has its principal place of business in Ballston Spa, New York, which is also located in the Northern District of New York. Additionally, within the set of GE's existing retirees who may have been represented by a Plaintiff union, there are roughly 50% more who reside in the Northern District of New York than in the Northern District of Ohio (which for its part contains only a small share of the nationwide total of such retirees). Notwithstanding that the factual connections for both GE and Plaintiffs all point to the Northern District of New York as the appropriate forum, Plaintiffs instead filed in the Northern District of Ohio. Furthermore, Plaintiffs then targeted the Youngstown sub-division rather than the Cleveland sub-division by misrepresenting in their civil cover sheet that GE's principal place of business within the district is a shuttered facility in Trumbull County rather than the headquarters of GE Lighting in Cuyahoga County.

*Second*, the transparent motive for Plaintiffs' factually illogical choice of venue is that they are forum shopping for legal precedent. The central issue in the case is what written language is required in CBAs or benefit plans to conclude that retirees have a vested lifetime right to employer-provided health benefits. In the Second Circuit, there is a well-established body of caselaw that rigorously requires plaintiffs to identify "language [which] affirmatively operates to create the promise of vesting," and that repeatedly rejects "attempt[s] to manufacture ambiguity" as to whether specific language is reasonably susceptible to interpretation as a promise to vest. *See, e.g.*, *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 133-35 (2d Cir. 1999). By contrast, in the Sixth Circuit, courts

2

have long applied *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and its progeny to establish a "presumption" of vesting supported by various "inferences." *See M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 934-35 (2015). Of course, the Supreme Court in *Tackett* recently overruled *Yard-Man* as contrary to ordinary principles of contract interpretation. *See id.* at 935-37. Nevertheless, unlike in the Second Circuit, the law in this circuit is currently undeveloped as to the proper application of those principles, and Plaintiffs plainly hope that it will develop in a manner that is more favorable to them than the Second Circuit's law. Tellingly, Plaintiffs filed their erroneous civil cover sheet in the Youngstown sub-division just ten days after this Court—the only one in this sub-division—had issued an opinion in another case reaching similar results in applying *Tackett* as it previously had in applying *Yard-Man* to the particular language at issue there. *See Zino v. Whirlpool Corp.*, No. 5:11CV01676, 2015 WL 6559579 (N.D. Ohio Oct. 30, 2015) (Pearson, J.).

Accordingly, considerations of litigation convenience and the interests of justice support a transfer to the Northern District of New York pursuant to 28 U.S.C. § 1404(a). Indeed, in other retiree-benefits cases presenting similar circumstances, this Court and others have properly exercised their discretion to transfer. *See, e.g.*, *Lewis v. Allegheny Ludlum Corp.*, No. 4:11CV2517, 2011 WL 6440873 (N.D. Ohio Dec. 21, 2011) (Pearson, J.).

## Background

1. Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, "[e]mployers or other plan sponsors are generally free …, for any reason at any time, to adopt, modify, or terminate welfare plans" for retiree health benefits, whereas pension plans are subject to automatic vesting rules. *Tackett*, 135 S. Ct. at 933. As the Second Circuit emphasized in a leading case, Congress recognized that "requir[ing] the vesting of … ancillary benefits" like medical insurance "would seriously complicate the administration and increase the cost of [such] plans," because they "are subject to fluctuating and unpredictable variables," such as "changes in medical

practice and technology" as well as "increases in the costs of treatment." *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 491-92 (2d Cir. 1998).  Since employers are not required to provide such benefits to their employees in the first place, Congress and the courts have been rightly concerned that a contrary approach would lead fewer employers to offer these benefits at all.  *See id.*

In fact, in the wake of the dramatic changes in the healthcare market over the past few decades, "the percentage of large firms offering retiree health coverage has dropped by more than half from 66 percent in 1988 to 28 percent in 2013," such that "fewer than one in five workers [in 2013 were] employed by firms offering retiree health benefits."  *See* Frank McArdle et al., *Retiree Health Benefits at the Crossroads* 1 (2014), *available at* http://goo.gl/HXZt5z.  Likewise, "employers that continue to offer benefits have made changes to manage their costs, often by shifting costs directly or indirectly to their retirees."  *See id.*

GE has long provided eligible retirees over age 65 with various health benefits as a supplement to the coverage provided by Medicare, which has always served as the primary source of health insurance for GE's retirees (as it is for most retirees in the United States).  *See, e.g.*, Complaint, Exh. A-D (Dkt. 1-1 to 1-4).  GE has expressly reserved the right to amend or terminate the plans providing those Medicare-supplement benefits, except as may be otherwise provided in a CBA.  *See, e.g.*, Complaint, Dkt. 1, ¶¶ 38, 45, 48, 50.  The numerous CBAs that GE and the Plaintiff unions periodically have negotiated since the 1970s—each of which was terminated upon entry of the next one, *see, e.g.*, *id.* ¶¶ 24, 67—reflected and incorporated multiple changes made by GE to the Medicare-supplement benefit plans over that time.  *See, e.g.*, *id.* ¶¶ 23-24.  GE has agreed in each CBA to apply the CBA's changes to the covered eligible employees who retired during the term of that CBA; GE also generally has chosen to extend such changes to those who had retired during the terms of prior CBAs.  *See, e.g.*, *id.*  Notably, as the Complaint concedes and as will be detailed further in GE's motion to dismiss (which will be filed soon if this case is not transferred), some of the

4

changes that were applied to existing retirees increased the costs shared by the existing retirees or were otherwise less favorable to them.  *See, e.g.*, *id.* ¶¶ 26, 65.

During the summer of 2015, GE decided to make the most recent changes to its Medicare-supplement retiree benefits (effective January 1, 2016).  While Plaintiffs initially attempt to characterize these changes as having "terminated" the benefits, *see, e.g.*, *id.* ¶ 15, Plaintiffs ultimately acknowledge that the changes are more modest in nature.  Previously, GE offered its eligible retirees company-sponsored plans providing coverage beyond Medicare for medical care, hospital visits, and prescription drugs; the coverage was the same for all retirees regardless of their individual needs, and retirees paid 100% of the cost of coverage for two of the plans while GE subsidized the other coverage costs to varying degrees depending on various criteria.  *See, e.g.*, Complaint, Exh. A-D (Dkt. 1-1 to 1-4).  Now, instead, GE is contracting with a private exchange whose trained counselors assist each retiree in selecting and purchasing insurance in the marketplace that meets their individual coverage needs; and GE is also providing certain retirees with a subsidy in the form of a reimbursement account for up to $1000 of eligible expenditures, plus reimbursement for certain prescription drug costs exceeding a threshold established by Medicare.  *See, e.g.*, Complaint, Dkt. 1, ¶¶ 36, 58.  As GE's motion to dismiss will explain in greater detail, not only do these changes make the Medicare-supplement retiree benefits more cost-feasible for GE, but they also provide retirees with the opportunity to obtain coverage better suited to their individualized circumstances than the one-size-fits-all coverage that GE previously provided—potentially leading to more cost-effective coverage for roughly three-quarters of retirees.  *See, e.g.*, Complaint, Exh. E (Dkt. 1-5).

Indeed, the Plaintiff unions themselves declared these changes to be "a reasonable post 65 health care package" when they accepted them in the 2015 CBA as applied to eligible union-represented employees who retire during the term of that agreement.  *See* Complaint, Dkt. 1, ¶¶ 54-56; *Bargaining Update Wednesday June 24, 2015*, IUE-CWA GE Workers United,

http://geworkersunited.org (last visited January 5, 2016).  Nevertheless, at the time of the 2015 CBA negotiations, the Plaintiff unions declined to discuss whether GE would apply these changes to existing retirees, notwithstanding that GE had informed the Plaintiff unions of its intent to follow its historical practice of applying health benefit changes for future retirees to past retirees as well.  *See, e.g.*, Complaint, Dkt. 1, ¶¶ 54-56.

Instead, the Plaintiff unions took the position, and all of the Plaintiffs now claim in the Complaint, that existing retirees who were previously represented by one of the unions have a "vest[ed]" lifetime right to the old benefits under prior benefit plans and CBAs, and that such benefits cannot be modified without the "consent[ ]" of the Plaintiff unions.  *See* Complaint, Dkt. 1, ¶¶ 27, 51, 55; *see also, e.g., id.* ¶¶ 1, 83-86, 92-95.  As GE's motion to dismiss will further explain, this claim suffers from at least two fundamental flaws.  *First*, Plaintiffs' position seriously misconstrues the CBAs and benefit plans at issue.  Flouting the principle of contract interpretation that contractual obligations ordinarily cease upon termination of the contract (*Tackett*, 135 S. Ct. at 937), Plaintiffs discount the express limitations in the provisions directly addressing the temporal scope of the promised benefits and also distort inapposite language in other provisions.  *Second*, Plaintiffs' position rests on a novel and incoherent argument.  In an effort to account for the fact that GE has previously applied adverse benefit changes to existing retirees, Plaintiffs argue that the unions purportedly "consented" to those changes; but it is black-letter law that the unions do not legally represent existing retirees (*see, e.g., Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 163-76 (1971)), and so the unions could not have authorized the adverse changes if the benefits actually were "vested," which they thus plainly were not.

    **2.**  The key facts relevant to whether to transfer venue in this particular case concern the geographic relationships among the parties, the benefit plans, and the CBAs.  None of those facts

6

points to the Northern District of Ohio (let alone to the Youngstown sub-division), and most of them point to the Northern District of New York and its vicinity.

For its part, GE is a New York corporation headquartered in Fairfield, Connecticut. Declaration of John Fischetti ¶ 4 ("Fischetti Decl."; attached as Exhibit A).  GE's principal place of business in New York is in Schenectady (in the Northern District of New York), where its largest industrial business, GE Power, is headquartered.  *Id.* ¶ 5.  Most importantly for present purposes, Schenectady is the location where GE administered the Medicare-supplement retiree benefit plans at issue.  *Id.* ¶ 6.  Among other things, Schenectady is where GE maintained its health-benefit enrollment files for retirees and from where GE has often communicated with retirees about health benefits.  *Id.*  All of the CBAs at issue were also negotiated in New York, over the course of several decades and more than a dozen agreements.  *Id.* ¶ 7.  Moreover, the CBAs themselves incorporated letters of understanding that were sent to the lead Plaintiff union, the IUE-CWA, at its location in Ballston Spa, New York (just outside Schenectady, and also in the Northern District of New York). *See, e.g.*, Complaint, Exh. F, Appx. H-R (Dkt. 1-7 at 34-54).  By contrast, while GE does have connections to Ohio, none bears any particular relationship to the benefit plans and CBAs at issue, and most fall outside the Northern District of Ohio's Youngstown sub-division.  Namely, GE Aviation is headquartered in Evendale (in the Southern District of Ohio), and GE Lighting is headquartered in East Cleveland (in the Northern District of Ohio's Cleveland sub-division); but the property that GE owns in Warren (which was the basis for Plaintiffs' filing in the Northern District of Ohio's Youngstown sub-division) is just the location of a facility that has been closed since January 2014.  Fischetti Decl. ¶¶ 15-16.

Likewise, for the Plaintiff unions, the IUE GE Conference Board was the lead union negotiator for all of the CBAs at issue, and its principal place of business is the Ballston Spa location in the Northern District of New York.  *Id.* ¶ 8; Complaint, Dkt. 1, ¶ 6.  None of the other Plaintiff

7

unions is located in the Northern District of Ohio. The IUE-CWA, the lead Plaintiff union, has its principal place of business in Dayton, Ohio (in the Southern District of Ohio). Complaint, Dkt. 1, ¶ 5. The remaining Plaintiff unions are located in Pennsylvania, Michigan, Maryland, and Washington, D.C. *Id.* ¶¶ 7-13. And all of the unions traveled to New York to negotiate the CBAs at issue. Fischetti Decl. ¶ 7.

Finally, for the putative class of retirees who were previously represented by the Plaintiff unions, GE has not consistently maintained data designating the specific sub-set of its retirees who were union-represented, but it has always maintained data designating the set of production retirees who were non-salaried employees (and who thus may have been union-represented). *Id.* ¶ 9. Based on GE's data, the number of non-salaried retirees who reside in the Northern District of New York is roughly 50% greater than the number of non-salaried retirees who reside in the Northern District of Ohio. *Id.* ¶¶ 10-14. Moreover, the number in the Northern District of Ohio is roughly equivalent to the number in the Southern District of Ohio, and only roughly 5.7% of the nationwide total. *Id.* Likewise, of the 28 individual Plaintiffs who seek to serve as class representatives, only 6 of them reside in the Northern District of Ohio, whereas 7 of them reside in the Northern District of New York and the remaining 15 reside elsewhere. Complaint, Dkt. 1, ¶ 14.

### Argument

1.     Under 28 U.S.C. § 1404(a), a federal district court may transfer a case to another district even where venue is lawful in the forum chosen by the plaintiff. As the Supreme Court has explained, the purpose of this transfer statute is "to protect litigants, witnesses and the public against unnecessary inconvenience and expense" or unfairness. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). District courts thus must exercise their "discretion to transfer cases … by considering convenience and fairness" based on the application of "a number of case-specific factors." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 537 (6th Cir. 2002).

This Court has repeatedly articulated the "factors" that "enter into [its] consideration of a motion for change of venue." *E.g.*, *Lewis*, 2011 WL 6440873, at *2 (Pearson, J.); *Morris v. Mid-Century Ins. Co.*, No. 4:11CV1836, 2012 WL 1551269, at *3 (N.D. Ohio Apr. 30, 2012) (Pearson, J.). The four principal factors are, of course, the ones expressly specified in the statute itself: "the convenience of the parties"; "the convenience of the witnesses"; "the interests of justice"; and "whether the civil action might have been brought in the district to which the movant requests a transfer." *Lewis*, 2011 WL 6440873, at *2; *see also* 28 U.S.C. § 1404(a). "[T]wo additional factors" are deference to the "plaintiff's choice of forum" and "the respective docket loads of the two district courts." *Lewis*, 2011 WL 6440873, at *2. While the balance of all these factors must "favor the party seeking the transfer," it "need not be strongly in favor." *Id.* (quotation marks omitted).

Importantly, this Court in *Lewis* held that the above-listed factors supported transfer in a closely analogous case concerning the alleged vesting of retiree health benefits. In that case, the employer and the union were both located in the Western District of Pennsylvania, they had negotiated the CBAs at issue there, and the majority of putative retiree class members resided there. *Id.* at 1 & n.1. Weighing the transfer factors in those circumstances, this Court concluded that transfer was appropriate for two over-arching reasons: *first*, "there was no real factual relationship to the forum"; and *second*, the plaintiffs were "engaged in forum shopping" because they "were trying to capitalize" on "favorable precedent" (namely, *Yard-Man* and its progeny). *See id.* at *2 (citing *Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*, 654 F. Supp. 734, 736-37 (D.D.C. 1986)); *see also Morris*, 2012 WL 1551269, at *4 (Pearson, J.) (citing the same two reasons in transferring an insurance dispute related to a car accident).

Other district courts in the Sixth Circuit have held likewise in retiree-benefits cases. As in *Lewis*, unions and individuals seeking to represent putative retirees classes have sometimes tried, when alleging the existence of vested health benefits, to obtain the legal advantage of *Yard-Man* and

9

its progeny by filing suit in districts within this circuit even though those districts lacked a real factual connection to the locations where the benefit plans at issue were administered, the CBAs at issue were negotiated, and the parties resided. And as in *Lewis*, courts in this circuit, when confronted with such forum shopping, have promptly exercised their discretion to transfer the cases in furtherance of litigation convenience and the interests of justice. *See, e.g.*, *Oakley v. Remy Int'l, Inc.*, No. 2:09-0107, 2010 WL 503125, at *4-7 (M.D. Tenn. Feb. 5, 2010); *UAW v. C.F. Gomma, U.S.A., Inc.*, No. 05-CV-71633, 2005 WL 1838344, at *4-5 (E.D. Mich. July 29, 2005).

    **2.** Under a proper application of the foregoing legal principles, this case should be transferred to the Northern District of New York. As in *Lewis*, there are two over-arching reasons why the various transfer factors support the conclusion that this lawsuit should not be litigated in the Northern District of Ohio, let alone in the Youngstown sub-division.

    **a.** Most fundamentally, the case has "no real factual relationship" to this venue. *See Lewis*, 2011 WL 6440873, at *2. None of the relevant conduct occurred here, and the parties have no significant connections here. By contrast, all of the relevant conduct occurred in or near the Northern District of New York, and many of the parties have substantial connections to that area.

    Of primary importance, the benefit plans at issue were not administered here, and the CBAs at issue were not negotiated here. Instead, the benefit plans were administered in the Northern District of New York, at GE's Schenectady facilities. Fischetti Decl. ¶ 6. Among other things, Schenectady is where GE maintained its health-benefit enrollment files for retirees and from where GE has often communicated with retirees about health benefits. *Id.* All of the CBAs at issue were also negotiated in New York, over the course of several decades and more than a dozen agreements. *Id.* ¶ 7. Indeed, certain letters of understanding incorporated into the CBAs were sent to the lead Plaintiff union, the IUE-CWA, at its Ballston Spa location, just outside Schenectady and also in the Northern District of New York. *See, e.g.*, Complaint, Exh. F, Appx. H-R (Dkt. 1-7 at 34-54).

10

Likewise, the parties have much stronger ties to the Northern District of New York than to this venue. As for GE: (1) it is a New York corporation; (2) its principal place of business in New York is in Schenectady (where GE Power, its largest industrial business, is also headquartered); and (3) its overall headquarters is located nearby in Fairfield, Connecticut. Fischetti Decl. ¶¶ 4-5. As for the Plaintiff unions: (1) the lead union negotiator for all of the CBAs at issue, the IUE GE Conference Board, has its principal place of business in the Northern District of New York at its Ballston Spa location; and (2) none of the other Plaintiff unions are located in this district. *Id.* ¶ 8; Complaint, Dkt. 1, ¶¶ 5-13. As for the putative retiree class: (1) the number of non-salaried retirees in the Northern District of New York is roughly 50% greater than the number in this district; (2) the number here is only roughly 5.7% of the nationwide total; and (3) there are 7 proposed class representatives who reside in the Northern District of New York, but only 6 who reside in the Northern District of Ohio (and 15 who reside elsewhere). Fischetti Decl. ¶¶ 9-14; Complaint, Dkt. 1, ¶ 14.

The lack of factual connection to this venue is underscored by the transparently tactical nature of Plaintiffs' particular choice of forum even within Ohio. Not only did Plaintiffs bypass the Northern District of New York, but they also bypassed the Southern District of Ohio, notwithstanding that: (1) the IUE-CWA, the lead Plaintiff union, is located in Dayton, (2) the headquarters of GE Aviation is located in Evendale; and (3) the number of non-salaried retirees in that district is roughly equivalent to the number in this one. Complaint, Dkt. 1, ¶ 5; Fischetti Decl. ¶¶ 9-14, 16. Even more tellingly, having chosen the Northern District of Ohio, Plaintiffs then targeted the Youngstown sub-division by misrepresenting that GE's "principal place of business" within this district is in Trumbull County due to GE's "ownership of property" at 1313 West Market Street in Warren. *See* Civil Cover Sheet, Dkt. 1-11, §§ III-IV; Complaint, Dkt. 1, ¶ 16. In actuality, the Warren property is the site of a facility that has been shuttered since January 2014, and GE's

11

principal place of business within this district is instead in Cuyahoga County and the Cleveland sub-division, at the headquarters of GE Lighting in East Cleveland. Fischetti Decl. ¶¶ 15-16.

In sum, none of the relevant facts in this case points to the Northern District of Ohio (much less to the Youngstown sub-division), and most of them point to the Northern District of New York and its vicinity. There is no dispute that this "civil action might have been brought" in the latter forum, and there can be no dispute that litigating the case there would significantly increase "the convenience of the parties" as well as "the convenience of the witnesses." *See Lewis*, 2011 WL 6440873, at *2. There will inevitably be many more potential witnesses and records found within the judicial district and nearby areas where the benefit plans at issue were administered, where all of the myriad CBAs at issue were negotiated, where GE has its headquarters, and where the lead union negotiator has its principal place of business—especially as compared to a venue like this one where nothing material occurred and no key persons are located.

**b.** Moreover, the obvious reason why Plaintiffs engaged in such clear "forum shopping" was to avoid "[un]favorable precedent." *See Lewis*, 2011 WL 6440873, at *2. The law in the Second Circuit is contrary to Plaintiffs' arguments here, whereas the law in the Sixth Circuit is currently unsettled.

In the Second Circuit, a plaintiff must identify "written language *capable of reasonably being interpreted* as creating a promise … to vest" health benefits upon retirement. *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 980 (2d Cir. 1997). Critical to the reasonableness of the interpretation in this context, "the text itself" must "affirmatively operate[] to create the promise of vesting," and unreasonable "attempt[s] to manufacture ambiguity" in the text through "linguistic contortion" will not suffice. *Joyce*, 171 F.3d at 134-35. Applying these ordinary principles of contract interpretation, the Second Circuit has repeatedly rejected arguments for vesting that, like the ones advanced by Plaintiffs here, are based merely on negative inferences from, or strained

12

constructions of, language in the relevant benefit plans and CBAs.  For example, the court held that the unexceptional fact that a benefit plan expressly provided for "termination" of retiree insurance upon "death or attaining the age … [of] eligib[ility] for Medicare" "cannot reasonably be read as binding [the employer] to vest the benefits at issue" otherwise.  *Id.* at 134.  Likewise, the court held that an employer's promise of benefits "to [a plan] participant's spouse for the remainder of his/her lifetime" "upon the death of [the] plan participant" did "not constitute affirmative language that could reasonably be interpreted as creating a promise to vest" "the benefits of the participants themselves" before their death.  *Bouboulis v. Transport Workers Union*, 442 F.3d 55, 62-63 (2d Cir. 2006).  Such Second Circuit caselaw would foreclose Plaintiffs' unreasonable attempts to manufacture a promise to vest based on textual snippets misleadingly cherry-picked from the benefit plans and CBAs at issue, *see, e.g.*, Complaint, Dkt. 1, ¶¶ 27, 51, especially where the CBAs have such clear termination provisions and the benefit plans have such clear reservations of rights to amend or terminate, *see, e.g., id.* ¶¶ 38, 67.

Plaintiffs thus have tried to evade the controlling force of precedent in the Second Circuit by filing within the Sixth Circuit instead.  To be sure, Plaintiffs can no longer rely on the "presumption" and "inferences" in favor of vesting that courts in the Sixth Circuit used to apply under *Yard-Man* and its progeny, because the Supreme Court recently overruled that precedent as contrary to ordinary principles of contract interpretation.  *See Tackett*, 135 S. Ct. at 934-37.  Nevertheless, the law in this circuit is currently undeveloped as to how those principles apply to particular types of contract language in this context—especially while the *Tackett* case remains pending in the Sixth Circuit on remand from the Supreme Court.  Plaintiffs are undoubtedly hoping that the law here may develop in a manner that is more favorable to them.

Not content to pick the governing law (or, more to the point, the relative absence thereof), Plaintiffs also have endeavored to pick the judge who will preside over the case.  This is revealed by

the fact that Plaintiffs gerrymandered the case into the Youngstown sub-division by misrepresenting GE's primary residence within the district. *Supra* at 11-12. As Plaintiffs were well aware, just ten days before they filed suit here, this Court—the only one in this sub-division—had issued an opinion in another case reaching similar results in applying *Tackett* as it previously had in applying *Yard-Man* to the particular language at issue there. *See Zino*, 2015 WL 6559579, at *2-8 (Pearson, J.). To be clear, *Zino* does not actually support Plaintiffs' merits position given the particular benefit plans and CBAs at issue here—especially the prior adverse benefit changes for existing retirees that Plaintiffs try to explain away by making the novel and incoherent allegation that the Plaintiff unions can somehow "consent" to the modification of the "vested" benefits of existing retirees whom they do not legally represent. *Supra* at 6. Nonetheless, it cannot credibly be disputed that Plaintiffs targeted this particular sub-division because of the recent legal decision in *Zino*, not because of this venue's (non-existent) factual connection to the case.

Accordingly, because Plaintiffs are forum shopping for caselaw, their "choice of forum" is entitled to minimal deference and "the interests of justice" also support transfer. *See Lewis*, 2011 WL 6440873, at *2. Plaintiffs' self-serving hope of gaining a legal advantage based on potential disuniformity of federal law across different fora is a particularly poor reason to allow the litigation of this case in a factually-unrelated forum.[1]

## Conclusion

For the foregoing reasons, this case should be transferred to the U.S. District Court for the Northern District of New York pursuant to 28 U.S.C. §1404(a).

---

[1] In addition, the courts' "respective docket loads" militates in favor of transfer too. *See Lewis*, 2011 WL 6440873, at *2. As of March 31, 2015—when the most recent statistics were published—the Northern District of Ohio had over five times as many cases pending as the Northern District of New York (10,415 vs. 2,032). *See* http://www.uscourts.gov/statistics/table/c-1/federal-judicial-caseload-statistics/2015/03/31.

14

Respectfully submitted.

/s/Stanley Weiner

Stanley Weiner (OH Bar No. 0083382)
sweiner@jonesday.com
Johanna Fabrizio Parker (OH Bar No. 0071236)
jfparker@jonesday.com
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
Telephone:  (216) 586-3939
Facsimile:   (216) 579-0212

Glen D. Nager (admitted pro hac vice)
gdnager@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-5464
Facsimile:   (202) 626-1700

Attorneys for Defendant
General Electric Company

CERTIFICATE OF SERVICE

      I hereby certify that, on January 6, 2016, a copy of this Memorandum of Points and Authorities in Support of Defendant's Motion to Transfer Venue was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

      /s/Stanley Weiner
      Stanley Weiner (OH Bar No. 0083382)

      Attorney for Defendant
      General Electric Company