PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IUE-CWA, *et al.*, | ) | |
| | ) | CASE NO.  4:15CV2301 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| GENERAL ELECTRIC COMPANY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | [Resolving ECF No. 46] |

Pending is Defendant General Electric Company's ("GE") Motion to Dismiss (ECF No. 46) the Complaint (ECF No. 1) pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law.  The Court has also considered the oral arguments of counsel offered during the Telephonic Status Conference on April 17, 2017.[1]  For the reasons set forth below, the Court grants the motion.

## I.  Background

### A.    The Benefit Plans and Collective Bargaining Agreements ("CBA") at Issue

GE has long provided eligible retirees past the age of 65 with certain health benefits to supplement coverage provided by Medicare, the primary source of health insurance for GE's post-65 retirees (as it is for most post-65 retirees in the country).  The case at bar concerns the following health Benefit Plans for post-65 retirees:  the GE Pensioners Prescription Drug Plan

---

[1]  The Court announced its inclination to grant the within motion during that conference.

 (4:15CV2301)

("Drug Plan") ([ECF No. 1-1](#)), the GE Medical Care Plan for Pensioners ("Medicare A Plan")

([ECF No. 1-2](#)), the GE Pensioners Hospital Indemnity Plan ("Hospital Plan") ([ECF No. 1-3](#)), and

the GE Medicare Insurance Plan for Part B Benefits ("Medicare B Plan") ([ECF No. 1-4](#)).[2]

The Benefit Plans covered prescription drugs as well as certain costs not covered by

Medicare for eligible medical care and hospital visits.  These one-size-fits-all Benefit Plans did

not provide eligible retirees the opportunity to choose coverage options tailored to their

individual needs, as the coverage was the same for all retirees.  *See* Drug Plan ([ECF No. 1-1](#)) at

PageID #: 46-50, §§ C-E; Medicare A Plan ([ECF No. 1-2](#)) at PageID #: 56-58, §§ C-E; Hospital

Plan ([ECF No. 1-3](#)) at Page ID#: 66-67, § III; and, Medicare B Plan ([ECF No. 1-4](#)) at PageID #:

77-81, § III.  Although Defendant sponsored the Benefit Plans, the retirees paid 100% of the

costs of coverage for the Hospital Plan and the Medicare B Plan, while GE subsidized the costs

for the Medicare A Plan and the Drug Plan to varying degrees.  *See* Drug Plan ([ECF No. 1-1](#)) at

PageID #: 45-46, § B; Medicare A Plan ([ECF No. 1-2](#)) at PageID #: 55-56, § B; Hospital Plan

([ECF No. 1-3](#)) at Page ID#: 65-66, § II; and, Medicare B Plan ([ECF No. 1-4](#)) at PageID #: 77, §

II; *see also* [ECF No. 1 at ¶¶ 35, 47, and 50](#).  GE offered the Benefit Plans to all eligible retirees,

including those who had not been union-represented employees (both salaried employees and

hourly production employees at non-union facilities) as well as those who had retired before the

effective date of the Plans.  *See* Drug Plan ([ECF No. 1-1](#)) at PageID #: 42-45, § A, PageID #: 50,

§ F.1; Medicare A Plan ([ECF No. 1-2](#)) at PageID #: 52-55, § A, PageID #: 59, § G.1; Hospital

---

[2]  Plaintiffs refer to these plans as the "Pensioner Plans."  *See* Memorandum in
Opposition ([ECF No. 50](#)) at PageID #: 946 n. 1.

2

(4:15CV2301)

Plan (ECF No. 1-3) at Page ID #: 63-65, § I, PageID #: 70, § IX.2; and, Medicare B Plan (ECF No. 1-4) at PageID #: 75-77, § I, PageID #: 84, § IX.2; *see also* ECF No. 1 at ¶¶ 32 and 42.

GE reserved its right to "amend[], suspend[], or terminate[]" each of the Benefit Plans "in whole or in part, at any time without limitation, except" for certain specified restrictions.  *See* Life, Disability and Medical Plan ("LDM Plan") (ECF No. 46-4) at PageID #: 840, Part IX. § F; Hospital Plan (ECF No. 1-3) at Page ID #: 67, § IV; and, Medicare B Plan (ECF No. 1-4) at PageID #: 67, § IV; *see also* ECF No. 1 at ¶¶ 38, 45, 48, and 50.  While there was language restricting changes that would adversely "affect the amount of GE Life Insurance Benefits . . . for [eligible] employees who have retired," there was no such language restricting changes to the health benefits of post-65 retirees.  *See* LDM Plan (ECF No. 46-4) at PageID #: 840, Part IX. § F. Instead, the sole exception at issue restricted changes to health benefits for post-65 retirees only "as may be otherwise provided in collective bargaining agreements."  *See* LDM Plan (ECF No. 46-4) at PageID #: 840, Part IX. § F; *see also* ECF No. 1 at ¶¶ 38, 45, 48, and 50.

GE and the "Plaintiff unions"[3] entered into a new CBA every three or four years from 1973 to 2015.  ECF No. 1 at ¶¶ 22-24.  At the end of negotiations for each new CBA, the parties executed a Memorandum of Settlement ("MOS") describing the agreed-upon changes to the old

---

[3]  IUE-CWA; IUE-CWA GE and Aerospace Conference Board; United Electrical, Radio & Machine Workers of America; International Brotherhood of Electrical Workers; International Association of Machinists and Aerospace Workers; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; International Federation of Professional and Technical Engineers; International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.  These nine unions formed the Coordinated Bargaining Committee of GE Unions ("CBC") to negotiate with GE.

3

(4:15CV2301)

CBA.  ECF No. 1 at ¶¶ 22-24; *see also*, *e.g.*, 2011 MOS (ECF Nos. 1-6 and 1-7).  The MOS

provided that the parties would then create a definitive "Settlement Agreement" reflecting those

changes.  *See e.g.*, 2011 MOS (ECF No. 1-6) at PageID #: 95, (1)-(3).  The part of the Settlement

Agreement relevant here is the Pension and Insurance Agreement ("PIA") (ECF No. 46-3), which

incorporated the terms of the pension and insurance plans agreed to by the parties.  *See* ECF No.

1 at ¶ 28.

Each PIA was "the exclusive and definitive Agreement between the parties with respect

to Pensions and Insurance" while it remained in effect.  ECF No. 46-3 at PageID #: 648, Title IV,

§ 4.  Each PIA attached black-lined versions of the Benefit Plans reflecting the changes described

in the MOS.  *See* ECF No. 46-3 at PageID #: 631, Title I, § 1(e); PageID #: 635-36, Title I,

Section 3(d),(g); *see also* ECF No. 1 at ¶ 28.  In each PIA, Defendant agreed that the Benefit

Plans would be "ma[de] available,"[4] and "[the unions] on their own behalf and on behalf of the

employees" agreed to accept the Benefit Plans and "the terms and conditions thereof to the extent

applicable to the employees."[5]  Each PIA limited "[t]he term 'employees'" to "employees so long

as they are within a bargaining unit" represented by the Plaintiff unions "during the term of [that

PIA]."  *See* ECF No. 46-3 at PageID #: 630-31, Title I, § 1(a).  As the Complaint (ECF No. 1)

indicates, the term "employees" did not include those who had "already retired" prior to the PIA

---

[4]  *See* PIA (ECF No. 46-3) at PageID #: 632, Title I, § 2(b); PageID #: 635-36,
Title I, § 3(d),(g).

[5]  *See* PIA (ECF No. 46-3) at PageID #: 636, Title I, § 4.

4

(4:15CV2301)

at issue and therefore were no longer within the unions' bargaining units.  *See* ECF No. 1 at ¶ 27(F); *see also Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 172 (1971) (holding retirees are not "employees" included in a bargaining unit for purposes of a union's role as exclusive representative).

Each PIA contained two provisions of significance to the case at bar – one governing Defendant's right to change the Benefit Plans and the other governing the duration of the parties' obligations.  First, each PIA provided that none of the Benefit Plans, "to the extent applicable to employees, shall be amended or terminated by [GE] so long as [the PIA] remain[ed] in effect." PIA (ECF No. 46-3) at PageID #: 638, Title I, § 7(b); *see also* ECF No. 1 at ¶ 27(F).  It appears that "this provision unambiguously establishes that . . . [GE] was free to reduce retiree medical benefits" "once the [PIAs] expired." *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997).  By its terms, this provision limits the promises to "employees," which Plaintiffs acknowledge does not include pre-existing retirees, and restricts the time limit of the promise to the time "this Agreement remains in effect."  By this language, GE committed not to change the Benefit Plans for the duration of the CBAs as to those "employees" who were part of the collective bargaining unit and retired during the term of the CBAs.  It imposes *no restriction*, however, even during the term of the CBA, on amending the Benefit Plans to the extent applicable to persons who had already retired.

Second, each PIA provided that it would "continue in full force and effect" for an initial fixed term of three or four years, "and from year to year thereafter," but also authorized either side to notify the other during a specified period of "its intention to terminate th[e] Agreement"

5

(4:15CV2301)

upon a certain date.  ECF No. 46-3 at PageID #: 648, Title IV, § 3; *see also* ECF No. 1 at ¶ 67.

And each PIA at issue – including the 2011 PIA, which was the last one addressing the Benefit

Plans – was terminated prior to the commencement of the new one.  *See* ECF No. 1 at ¶¶ 24, 28,

and 54.  Plaintiffs reference a 2011 PIA provision stating that "insured employees will pay the

monthly contributions set forth in [the LDM Plan, including the Drug Plan and the Medicare A

Plan]" and that "[GE] will pay the balance of the net cost of such Plans.  It will also pay any

increases in such cost;" and another stating that GE's ability to select between a group policy or a

trust "shall not diminish in any way [its] obligation to be responsible for and to make available

the benefits described in [the] Plans."  PIA (ECF No. 46-3) at PageID #: 642, Title II, § 3;

PageID #: 641, Title II, § 2(a).  These provisions do not speak to the duration of GE's obligation

to provide these benefits.

On September 5, 2014, during the term of the 2011 CBA, the Board of Directors of GE

adopted a resolution effective January 1, 2015 stating that "all retiree healthcare benefits

provided under the [LDM Plan and other Plans] are hereby transferred to separate ERISA benefit

plans for retirees which are hereby established."  Extract from Minutes of Meeting of the GE

Board (ECF No. 1-10) at PageID #: 215, § E.  The Plaintiff Unions were not informed of the new

plan structure until after the conclusion of the 2015 negotiations with GE and never consented to

the change in the Benefit Plans made by the Resolution of the Board of Directors.  ECF No. 1 at

¶ 75.

6

(4:15CV2301)

**B.**    **The Benefit Changes Challenged in the Case at Bar**

On January 1, 2016, Defendant replaced the one-size-fits-all Benefit Plans with an alternative arrangement that, according to GE, provides retirees with access to the same types of coverage in a manner that can be more tailored to retirees' individualized preferences.[6]  Pursuant to a contract with GE, a private exchange's trained counselors assist post-65 retirees in selecting and purchasing insurance in the private marketplace that meets their particular coverage preferences for prescription drugs and for eligible medical care and hospital visit costs not covered by Medicare.  *See, e.g.*, Notice to Members (ECF No. 1-5); *see also* ECF No. 1 at ¶¶ 36 and 58.  GE also provides certain post-65 retirees with a reimbursement account for up to $1,000 of eligible expenditures, plus reimbursement for certain prescription drug costs exceeding a threshold mandated by Medicare.  GE posits that these changes make providing post-65 retiree health benefits more financially manageable for GE, while affording many retirees the opportunity to obtain more cost-effective coverage.  *See, e.g.*, Notice to Members (ECF No. 1-5).

---

[6]  Plaintiffs respond by noting that they have alleged that GE has imposed on thousands of retirees up to $4,850 in co-pays each year, "a significant amount of money to be borne by elderly retirees who are living on fixed incomes."  ECF No. 1 at ¶¶ 36-37.  ECF No. 50 at PageID #: 952 n. 6.

Most Medicare Prescription Drug Plans have a coverage gap (also known as the "donut hole").  This means there is a temporary limit on what the drug plan will cover for drugs.  Not everyone will enter the coverage gap.  The coverage gap begins after a beneficiary and their drug plan have spent a certain amount for covered drugs.  In 2017, once the beneficiary and their plan have spent $3,700 on covered drugs, the individual is in the coverage gap.  This amount may change each year.  https://www.medicare.gov/part-d/costs/coverage-gap/part-d-coverage-gap.html (last visited April 18, 2017).

 (4:15CV2301)

In the 2015 CBA, Plaintiff unions accepted these changes for eligible union-represented employees who would retire during the term of that agreement.  ECF No. 1 at ¶¶ 54-56. Plaintiffs' announcement described the new program as "a reasonable post 65 health care package for current employee[s] who will retire under this Agreement."  *See* IUE-CWA GE Workers United, "Bargaining Update Wednesday June 24, 2015," http://geworkersunited.org (last visited July 18, 2017).[7]

On November 9, 2015, the Plaintiff unions, along with twenty-eight (28) retirees[8] seeking to represent a putative class, filed this lawsuit.  *See, e.g.*, ECF No. 1 at ¶¶ 1, 5-14, and 77-79. The Complaint (ECF No. 1) identifies four counts, but appears to raise only three claims, apart from seeking declaratory judgment.  Defendant's renderings of Plaintiffs' claims are reasonable.

> First, Plaintiffs principally claim that union-represented employees who retired prior to the 2015 CBA have a "vested," post-CBA right to unalterable, lifetime post-65 health benefits under the Benefit Plans and CBA in effect at the time of their respective retirements.  ECF No. 46-1 at PageID #: 609; *see also* ECF No. 1 at ¶¶ 27, 51, 83-85, and 92-95.
>
> Second, Plaintiffs claim that Defendant's decision to replace the Benefit Plans with an alternative set of health benefits for post-65

---

[7]  Plaintiffs object to Defendant's use of this newsletter because it is not "part of the pleadings."  ECF No. 50 at PageID #: 952 n. 6.  Although the district courts ordinarily do not consider matters outside a complaint when deciding whether to dismiss it for failure to state a claim, *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1999), *overruled on other grounds*, *Swierkiwica v. Sorema, N.A.*, 534 U.S. 506 (2002), they may consider public records and any other matters of which the court may take judicial notice under Fed. R. Evid. 201(b).  *Schreane v. Patterson*, No. 1:12-cv-323, 2014 WL 415957, at *3 (E.D.Tenn. Feb. 4, 2014).

[8]  Two (2) Individual Plaintiffs have since voluntarily dismissed without prejudice their individual claims only and withdrew as putative class representatives.  *See* Notices of Dismissal (ECF Nos. 42 and 48).

(4:15CV2301)

retirees was a breach of fiduciary duty." ECF No. 46-1 at PageID #: 609; s*ee also* ECF No. 1 at ¶¶ 92-95.

Third, independent of the change in benefits, Plaintiffs claim that GE acted unlawfully when it changed the organizational structure of the Medicare A Plan and the Drug Plan while those Plans were still in effect—*i.e.*, by transferring them out of the LDM Plan and into a separate retirees-only plan as of January 1, 2015. ECF No. 46-1 at PageID #: 609; s*ee also* ECF No. 1 at ¶¶ 74-76, 87, and 96.

## II.  Standard of Review

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint." *Twombly*, 550 U.S. at 564. A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal* , 556 U.S. at 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. It must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard is not akin to a

9

(4:15CV2301)

"probability requirement," but it asks for more than a sheer possibility that a defendant has acted

unlawfully. *Twombly*, 550 U.S. at 556. Where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted). "[When] the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at

679 (quoting Rule 8(a)(2)). The Court "need not accept as true a legal conclusion couched as a

factual allegation or an unwarranted factual inference." *Handy-Clay v. City of Memphis, Tenn.*,

695 F.3d 531, 539 (6th Cir. 2012) (citations and internal quotation marks omitted).

When parties offer alternative constructions of a contract, dismissal is only proper if the

interpretation of the party seeking dismissal is the only reasonable construction under the

applicable law. *Neely v. Crown Solutions Co., LLC*, No. 3:13-cv-00109, 2013 WL 6056205, at

*11 (S.D. Ohio Nov. 15, 2013) (citation omitted). "A court should not choose between

reasonable interpretations of ambiguous contract provisions when considering a motion to

dismiss under Rule 12(b)(6)." *More Than Gourmet, Inc. v. Christian Potier, S.A.*, No.

5:13CV1966, 2014WL 4245961, at *6 (N.D. Ohio Aug. 26, 2014) (Lioi, J) (quoting *Ajuba Int'l,

L.L.C. v. Saharia*, 871 F. Supp.2d 671, 689 (E.D. Mich. 2012)).

The reviewing court may consider "exhibits attached to defendant's motion to dismiss so

long as they are referred to in the complaint and are central to the claims contained therein."

*Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008); *see also* *Kreipke v. Wayne State Univ.*, 807

F.3d 768, 782 (6th Cir. 2015) ("[W]hen a written instrument contradicts allegations [about it] in

 (4:15CV2301)

the complaint . . ., the exhibit trumps the allegations.") (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).

### III. Analysis

In *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015) ("*Tackett*"), the Supreme Court overruled *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (1983), finding that the Sixth Circuit's "*Yard-Man* inference" in favor of vesting contravened ordinary principles of contract law.  On remand, the Sixth Circuit analyzed the Supreme Court opinion and enumerated the ordinary principles of contract law from both the majority and concurring opinions in *Tackett* that should frame that inquiry.  *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204 (6th Cir. 2016) ("*Tackett III*"); *Reese v. CNH Industrial N.V.*, 854 F.3d 877, 882 (6th Cir. 2017) ("*Reese III*") ("Thus, relying heavily on Justice Ginsburg's concurrence, *Tackett III* removed presumptions in favor of vesting, but also explicitly declined to shift that presumption to the employer.").

After *Tackett*, the Sixth Circuit revisited the issue of retiree healthcare benefits in *Gallo v. Moen Inc.*, 813 F.3d 265 (6th Cir.), *reh'g en banc denied* (Mar. 16, 2016), *cert. denied*, 137 S. Ct. 375 (2016).  Relying on *Yard-Man*, the district court had concluded that Moen retirees had a vested right to healthcare benefits.  Shortly after the district court issued its decision, however, the Supreme Court decided *Tackett*.  In *Gallo*, the Sixth Circuit reversed the district court's grant of summary judgment and remanded the case for the district court to enter judgment in the employer's favor.  *Id.* at 274.

In *Gallo*, the Sixth Circuit found that the contracts at issue did not indicate intent to vest retirees with lifetime healthcare benefits.  The court found that, as applied to the contracts in

11

(4:15CV2301)

question, ordinary principles of contract law required the conclusion that no vesting had

occurred. *Id.* Ultimately, the court held the CBAs at issue did not provide for unalterable,

lifetime healthcare benefits. *Id.* at 268-69. ("That is what matters, and that is where the

plaintiffs fall short.").

The Sixth Circuit also noted that "[w]hen a specific provision of the CBA does not

include an end date, we refer to the general durational clause to determine that provision's

termination." *Id.* The presence of a general durational clause is not dispositive, but without a

specific limit or indicia of ambiguity, a court will typically presume that the duration of a

provision is governed by the general durational clause. *See Reese III*, 854 F.3d at 882–83; *Int'l*

*Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW) v. Kelsey-Hayes*

*Co.*, 854 F.3d 862, 868-69 (6th Cir. 2017) (*"UAW v. Kelsey-Hayes"*). Because the *Gallo* retiree

healthcare benefit provision did not expressly provide for lifetime benefits, did not include a

specific end date, and the CBAs did not otherwise indicate ambiguity by, for example,

segregating healthcare benefits from other entitlements in the CBA or coupling healthcare and

pension benefits, the general 3-year durational clause applied. *Gallo*, 813 F.3d at 269, 271; *see*

*also Reese III*, 854 F.3d at 883. Accordingly, Moen's obligation to provide retiree healthcare

benefits ended when the 3-year CBA expired. *Gallo*, 813 F.3d at 269, 271.

To punctuate its point, the appellate court reiterated that the *Gallo* CBAs at issue

promised that "*[c]ontinued* hospitalization, surgical and medical coverage will be provided

without cost" to former employees who retired under prior CBAs. The Sixth Circuit reasoned

that this provision would not have been necessary if prior agreements had, in fact, already caused

12

(4:15CV2301)

the right to such benefits to vest. *Id.* at 270 (emphasis added in original). In *Gallo,* the Court also found that, standing alone, the use of future tense language, *i.e.*, "will be" provided, was insufficient evidence of intent to vest. *Id.* at 271 (citing *Tackett*, 135 S. Ct. 937); *Cole v. Meritor, Inc.*, 855 F.3d 695, 700 (6th Cir. 2017) ("The 'shall be continued' language [ ] is thus not sufficient to vest the retirees with healthcare benefits for life."). The *Gallo* Court held that, regarding the particular set of CBAs before it, the general durational clause governed; the "continued" and related provisions merely "*guarantee[d]* benefits until the agreement expire[d], nothing more."[9] *Gallo*, 813 F.3d at 269 (emphasis in original).

Finally, the appellate court rendered that the CBAs at issue in *Gallo* explicitly guaranteed lifetime *pension* benefits, but not lifetime *healthcare* benefits. Because 29 U.S.C. § 1053(a) requires employers to state explicitly in pension plans that such benefits are vested, the use of the word "vested" in connection with pension benefits, but not healthcare benefits, is insufficient to indicate intent to vest one but not the other. The *Gallo* CBAs went beyond mere word choice, however, and expressly stated that pension benefits would continue on beyond the life of other benefits. *Gallo*, 813 F.3d at 270 (noting that the *Gallo* CBAs specified that "when [certain] benefits are no longer payable . . . the normal monthly survivor pension benefit will be paid for

---

[9] The *Cole* court stated:
> The CBAs also contained durational clauses that supplied a concrete date of expiration for retiree healthcare benefits. These durational clauses give meaning to the promise that healthcare benefits "shall be continued." That is, Meritor guaranteed healthcare benefits only until the expiration of the final CBA, nothing more.

2017 WL 1404188, at *5 (citing *Gallo*, 813 F.3d at 269).

13

(4:15CV2301)

the rest of the survivor's life.").  The court opined that, "we must assume that the explicit

guarantee of lifetime benefits in some provisions and not others means something."[10]  *Id.*

### A.    Vesting Claim

Plaintiffs claim that, in its pre-2015 CBAs, GE contractually committed to provide

unalterable medical benefits for life to union retirees.  According to Plaintiffs, Defendant

unambiguously promised to continue the Benefit Plans.  ECF No. 50 at PageID #: 946-49.  The

CBAs state that the Drug Plan and the Medicare A Plan "shall be made available" and also state

that "GE agrees . . . it will make available [the Hospital Plan and the Medicare B Plan] to

pensioners when they attain age 65 and after they have retired."  PIA (ECF No. 46-3) at PageID

#: 635-36, Title I, § 3.  According to Plaintiffs, unlike in *Gallo*, "the GE contracts emphatically

state that GE shall make the negotiated benefits available for retirees and do not rest merely on

an invocation of the future tense."  ECF No. 50 at PageID #: 953.

---

[10]  Additionally, the court in *Gallo* rejected plaintiffs' argument that intent to vest
could be found in the fact that eligibility for retiree healthcare benefits was tied to
eligibility for pensions.  *Id.* at 272.  Although the Sixth Circuit has noted that the tying of
pension and healthcare benefits may suggest ambiguity, *Reese III*, 854 F.3d at 883, it has
not found that tying of benefits, alone, indicates an intent to vest, or creates sufficient
ambiguity to consider extrinsic evidence.  Furthermore, the *Gallo* court noted that a mere
connection between healthcare and pension benefits is not enough to demonstrate
ambiguity—the benefits' durations must be intertwined.  *Gallo*, 813 F.3d at 272 (citing
*Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring)).

Accordingly, because the *Gallo* Court concluded that the unambiguous language
of the most recent CBA offered "no evidence of any intent to fix these benefits
permanently into the future," it refused to consider any extrinsic evidence.  *Id.* at 273-74.
If the CBA's language is clear and unambiguous, "its meaning is to be ascertained in
accordance with its plainly expressed intent."  *Tackett*, 135 S. Ct. 933 (quoting 11 R.
Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).  At that point, the parties'
intent, as discernable in unambiguous language, controls.  *Id.*

 (4:15CV2301)

Each of the Benefit Plans clearly and expressly reserved GE's right to amend or terminate the Plans at any time for any reason, subject *only* to any restrictions on amendment imposed by the CBAs.  Unless restricted from doing so by the CBAs, therefore, GE had the right to amend or terminate the Plans as it deemed appropriate.  In *Sprague v.Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (*en banc*), the Sixth Circuit rejected a vesting claim similar to Plaintiffs' claim in the case at bar on the ground that the benefit plans unambiguously "reserved a right on GM's part to amend or terminate the plan." *Id.* at 399.  In the instant case, after the CBAs terminated, the reservation of rights clause became indistinguishable from the reservation of rights at issue in *Sprague.*[11]

The Benefit Plans at issue were subject to express reservation of rights provisions authorizing GE to amend or terminate the Plan "at any time without limitation" except as provided in the CBAs.  *See* LDM Plan (ECF No. 46-4) at PageID #: 840, Part IX. § F; Hospital Plan (ECF No. 1-3) at Page ID #: 67, § IV; and, Medicare B Plan (ECF No. 1-4) at PageID #: 67, § IV; *see also* ECF No. 1 at ¶¶ 38, 45, 48, and 50.  Also, the explicit terms of the CBAs restricted GE's right to amend or terminate the Benefit Plan only "so long as [the CBA] remain[ed] in effect." *See* PIA (ECF No. 46-3) at PageID #: 638, Title I, § 7(b).  Once the CBAs promising the contested benefits ended, so too did any restriction on GE's right to amend or terminate the Plans.  Although *Tackett* did not create a clear statement rule, a retiree-benefits vesting claim

---

[11]  This is so even though, as Plaintiffs point out, "[t]he *Sprague* reservations of rights clause stated:  'General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet' and contained no reference to limiting CBAs since *Sprague* involved unrepresented salaried employees who had no CBA." ECF No. 50 at PageID #: 955 n. 10 (citing *Sprague*, 133 F.3d at 393 n.1, 394.).

(4:15CV2301)

fails as a matter of law when there is no contract language that can be reasonably interpreted as a commitment by the employer to provide the benefits post-CBA and for the lifetimes of the beneficiaries, and there is no evidence of ambiguity in the contract. *Gallo*, 813 F.3d at 268-69, 274.  This leaves the duration of GE's promise to provide health benefits to union retirees as the only relevant question to be answered.

Following *Sixth Circuit* jurisprudence, contract language cannot reasonably be interpreted to vest post-CBA benefits when the employer's promise to provide benefits is subject to an express provision defining the duration of the agreement *and* an express reservation of the right to amend the benefits.  *See Gallo*, 813 F.3d at 269 ("These terms *guarantee* benefits until the agreement expires, nothing more.") (emphasis in original); *Serafino v. City of Hamtramck*, No. 14-14112, 2016 WL 5390857, at *6 (E.D.Mich. Sept. 27, 2016) ("even a promise of coverage 'until your death' provides retirees with lifetime healthcare coverage only during the effective period of the CBA under which they retired, absent other vesting language"); *cf. Reese III*, 854 F.3d 887 (finding that the CBAs, which did not include reservation of rights clauses, to be ambiguous as to the duration of healthcare benefits); *UAW v. Kelsey-Hayes*, 854 F.3d at 872 (same).

"[A]greements contain[ing] reservation-of-rights clauses [ ] evidence an intent not to vest," and "the caveat—that certain 'benefits' must be 'maintained' . . .  only 'for the life of this Agreement'" establishes "a timeline that is incompatible with construing the agreement to create vested and unalterable benefits." *Gallo*, 813 F.3d at 270.  Contrary to Plaintiffs' position that "[t]here is no similar provision in the GE CBAs or the Pensioner Plans limiting retiree benefits to

16

(4:15CV2301)

the life of the CBAs," ECF No. 50 at PageID #: 954, GE specifically reserved the right in the

Benefit Plans themselves to amend or terminate the Plans at any time for any reason, subject only

to any restrictions on amendment imposed by the CBAs.  GE also agreed in the CBAs to restrict

its right to amend or terminate the Plans only "so long as [the CBAs] remain[ ] in effect."  *See*

PIA (ECF No. 46-3) at PageID #: 638, Title I, § 7(b).[12]  Together, these reservation of rights

clauses evidence a clear intent not to vest benefits and merely to restrict GE's right to amend only

during the duration of the CBAs.

The CBAs promised that the Benefit Plans would be "made available" to employees who

retired during the CBA's term, but contain no durational provision extending that promise

beyond the termination of the CBAs.  *See* PIA (ECF No. 46-3) at PageID #: 632 Title I, § 2(b).

*Gallo*, 813 F.3d at 269 (terms like "will be covered" must be read "in conjunction with the

general durational clause," such that they "guarantee benefits until the agreement expires,

nothing more.").  The last of the CBAs in which GE agreed to make the Plans "available"

terminated in mid-2015, a point Plaintiffs do not dispute.  ECF No. 50 at PageID #: 956.

Plaintiffs argue that the CBAs' general termination provisions do not apply to retirees

and, thus, unlike *Gallo*, the "made available" provisions have no end to them.  Plaintiffs also

---

[12]  Plaintiffs cited *Reynolds v. Resolute Forest Products, Inc.*, No. 1:16-CV-48-TAV-CHS (E.D. Tenn. filed March 1, 2017), during the April 17, 2017 Telephonic Status Conference.  In *Reynolds*, the district court denied a motion to dismiss retiree claims for vested healthcare benefits, "find[ing] that the CBAs are ambiguous concerning the parties' intent to vest retiree health care benefits, particularly with regard to the benefits' connection with active employees' benefits.  *Id.* at 18.  The CBAs at issue in *Reynolds*, in the eyes of the court, called into question the unilaterally reserved right to terminate retiree health benefits in the Health Plan.

17

(4:15CV2301)

argue that the unions were acting only on behalf of "employees," defined as those individuals

within the collective bargaining agreement during the term of the CBA, and as such the

termination provision only governed obligations applicable to the "employees within [the]

bargaining units" and not "to retirees who are not within the Unions' bargaining units."  ECF No.

50 at PageID #: 950.  In *Tackett III*, the Sixth Circuit noted:

> [W]hile the Supreme Court's decision prevents us from presuming that "absent
> specific durational language referring to retiree benefits themselves, a general
> durational clause *says nothing* about the vesting of retiree benefits," we also
> cannot presume that the *absence* of such specific language, by itself, evidences an
> intent *not* to vest benefits or that a general durational clause says *everything* about
> the intent to vest.

811 F.3d at 209 (quoting *Tackett*, 135 S. Ct. 935, 937) (emphasis in original).

In *Gallo*, unlike in the case at bar, the CBAs at issue included a specific durational

provision authorizing the company to end employee health benefits for terminated employees,

but did not include a specific durational provision for retiree health benefits.  813 F.3d at 271.

And there, as here, the plaintiffs argued that the comparative "absence of specific durational

limits in the retiree benefits provisions . . . mean[t] that these benefits were meant to last for life."

*Id.*  The Sixth Circuit rejected that argument, holding: "specific and general terms usually work

in tandem. . . . The CBAs' general durational clauses provide a baseline or default rule, a point at

which the agreements expire *absent more specific limits* relevant to a particular term.  In the

absence of specific language in the retiree healthcare provisions, the general durational clause

controls." *Id.* 271-72 (emphasis in original); *Cole*, 2017 WL 1404188, at *5.  That holding bars

Plaintiffs' argument here.  Moreover, Plaintiffs have made no showing of additional ambiguity to

18

(4:15CV2301)

overcome the presumption that the general durational clause controls.  *Reese III*, 854 F.3d at 883.

Plaintiffs do not distinguish *Gallo*, citing instead *Reese v. CNH Industrial N.V.*, 143 F. Supp.3d 609 (E.D. Mich. 2015), *aff'd and remanded*, 854 F.3d 877 (6th Cir. 2017), and *United Steel, Paper, Forestry v. Kelsey-Hayes Co.*, No. 4:11-CV-15497, 2016 WL 337467 (E.D. Mich. Jan. 28, 2016), appeal pending, No. 16-1240 (6th Cir.) (*USW v. Kelsey-Hayes*),[13] two earlier decisions from another district court.[14]  In *Reese*, the Sixth Circuit recently found the general-durational clause at issue in that case did not cure any ambiguity as to the duration of benefits, and affirmed the district court's vesting determination finding that the CBA is ambiguous and the extrinsic evidence indicated that the parties intended for the healthcare benefits to vest for life.  2017 WL 1404390, at *1, 4.  This decision rested on the ambiguity of the CBAs.  In contrast, in the case at bar, Plaintiffs argue:

> GE UNAMBIGUOUSLY PROMISED TO CONTINUE THE [BENEFIT PLANS].  ECF No. 50 at PageID #: 946.

> The PIA's unambiguously require GE to provide the [Benefit] Plans for the life of the retirees.  ECF No. 50 at PageID #: 946.

---

[13]  In *UAW v. Kelsey-Hayes Co.*, 854 F.3d 862, No. 15-2285, 2017 WL 1404189 (6th Cir. April 20, 2017), the Sixth Circuit affirmed the district court's award of partial summary judgment to a group of retirees who had worked at a closed plant and modified the permanent injunction entered in plaintiffs' favor in another retiree healthcare benefits case.  *Id.* at *1, 9.  The Court found multiple ambiguities within the language of the 1998 CBA that provided healthcare benefits "shall be continued for such employees who retire. . . ."  *Id.* at *5-6.  The case at bar, however, lacks the characteristics that created ambiguity as to vesting in *Kelsey-Hayes*.

[14]  Courts cannot "refus[e] to apply general durational clauses" based on implications and inferences from contractual provisions that are instead capable of being read "in conjunction with the general durational clause" rather than in conflict with it.  *Gallo*, 813 F.3d at 269-70.

19

(4:15CV2301)

> The 2011 PIA further unambiguously provides at Title II, Section 3 that "insured employees will pay the monthly contributions set forth in [the LDM Plan, including the [Drug Plan] and the [Medicare A] Plan]" and that "<u>The Company will pay the balance of the net cost of such Plans.</u>  ECF No. 50 at PageID #: 947.

Unlike the *Reese* and *USW v. Kelsey-Hayes* plaintiffs, Plaintiffs at bar do not argue that the contracts are ambiguous—instead, they argue that the contracts clearly state the parties' intent.  If that is the case, there is no need to examine the extrinsic evidence.  "When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further.  But when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties."  *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring) (citations to 11 Williston §§ 30:6-7 omitted).  Contractual ambiguity "gives courts a warrant to search the record for extrinsic evidence of contractual meaning."  Without a textual finding "that there are two competing interpretations, both of which are fairly plausible readings of the language[,]" the Court cannot consider Plaintiffs' proffered extrinsic evidence.  *Reese*, 2017 WL 1404390, at *11 (Sutton, J., dissenting) (citations omitted).

*Gallo* also suggested that a claim of vesting cannot be sustained where the employer has expressly promised to vest other benefits post-CBA, but not the benefits at issue.  *Gallo*, 813 F.3d at 270 (noting that the *Gallo* CBAs explicitly specified that "when [certain] benefits are no longer payable . . . the normal monthly survivor pension benefit will be paid for the rest of the survivor's life" but made no such promise for health care benefits).  Defendants errantly rely on the CBAs explicit guarantee of lifetime *pension* benefits, but not lifetime *healthcare* benefits.  As earlier discussed,  29 U.S.C. § 1053(a) requires employers to state explicitly in pension plans that

20

(4:15CV2301)

such benefits are vested, but there is no such law for welfare benefits. ECF No. 449 at PageID #: 13771 n. 3. Therefore, the Court cannot assume intent behind the obligatory inclusion of the word "vested" in the pension plans or its absence in the welfare plans. It can not be ignored, however, that, in the instant case, LDM Plan precludes an amendment of the amount of LDM retiree life insurance benefits available to retirees. ECF No. 46-4 at PageID #: 840, Part IX. § F. The parties explicitly provided for certain retiree life insurance benefits to vest, but not medical benefits. This language shows GE retained the ability to amend or terminate the Benefit Plans.[15] The *Gallo* court also rejected plaintiffs' argument that intent to vest could be found in the fact that eligibility for retiree healthcare benefits was tied to eligibility for pensions. *Id.* at 272.[16]

It is worth noting that agreements that reduce benefits evidence an intent not to vest. This is so even when the union claims to have consented to such reductions, because a unions could not legally consent to a reduction in preexisting retirees' benefits if those benefits were actually vested. Here, it is undisputed that the CBAs reduced certain medical benefits over time.

---

[15] Had the parties intended to restrict post-CBA changes to the Benefit Plans, they would not have restricted changes only "so long as [the PIA] remain[ed] in effect." PIA (ECF No. 46-3) at PageID #: 638, Title I, § 7(b). They would have restricted changes for "so long as an employee remains retired" – just as they did to vest certain retiree life insurance benefits. *See* LDM Plan (ECF No. 46-4) at PageID #: 840, Part IX. § F.

[16] The *Reese III* court noted that although an intent to vest cannot be inferred from tying of pension and healthcare benefits, tying can create ambiguity. *Reese III*, 854 F.3d at 883–84. Regardless, it is a stretch for Plaintiffs to argue their healthcare benefits were tied to pension benefits. In reality, the pension and healthcare benefits were merely related. The Plans did not make eligibility for pension benefits a prerequisite for retiree healthcare, or otherwise tie the duration of healthcare benefits to the duration of pension benefits. *Gallo*, 813 F.3d at 271 (citing *Tackett III*, 135 S. Ct. 938 (Ginsburg, J., concurring)).

21

(4:15CV2301)

That union retirees' post-65 health benefits were not vested is further confirmed by Plaintiffs' admission at ¶ 65 of the Complaint (ECF No. 1) that the CBAs themselves recognized prior adverse Benefit Plan "changes in the terms available to existing retirees." This admission contradicts the Plaintiffs' claim that those retirees had lifetime vested benefits. Plaintiffs admit, for example, that the 2011 CBA "increased . . . prescription drug co-pays" for pre-existing retirees. Defendant notes that between the 2000 and 2011 CBAs:

> (1) the mail-order co-pay for pre-1/1/04 enrollees increased by 75% (from $20 to $35);
> (2) the mail-order co-pay for brand-name drugs for post-1/1/04 enrollees increased by roughly 80% (from $36 to $65);
> (3) the retail co-pay for brand-name drugs for post-1/1/04 enrollees increased by nearly 90% (from $16 to $30); and
> (4) a review program was added to exclude drugs that were not "reasonable, necessary and customary."

See Excerpts from the 2000, 2003, 2007, and 2011 PIAs (ECF No. 46-7).

Relying on *Reese v. CNH Industrial N.V.*, No. 04-70592, 2007 WL 2484989, at *6 (E.D. Mich. Aug. 29, 2007), *aff'd in part and rev'd in part*, 574 F.3d 315 (6th Cir. 2009) (quoting *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1042 (E.D. Mich. 1994), two decisions from another district court, Plaintiffs argue that the terms of the 2011 MOS between the CBC and GE show that the terms of the Drug Plan for existing retirees were left largely intact for pre-2004 retirees and "materially changed" only for post-2004 retirees with the permission of the CBC. ECF No. 50 at PageID #: 962. Again, unions, however, cannot legally consent to a reduction in preexisting retirees' benefits if those benefits were actually vested. Instead, Plaintiffs insinuate that the prior adverse changes might have been a breach of the pre-existing retirees' alleged vested rights that those retirees simply chose to "tolerat[e]." ECF No. 50 at PageID #: 962.

22

(4:15CV2301)

A series of contracts that "reduce[d] benefits to be paid to all retirees" "cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another." *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1519 (8th Cir. 1988) (quoting and affirming *Anderson v. Alpha Portland Indus.*, 647 F. Supp. 1109, 1127 (E.D.Mo. 1986)), *cert. denied*, 489 U.S. 1051 (1989)). Construing a contract itself to be breaching the very promises it makes would do violence to the principle that courts "must not interpret one provision inconsistently with another." *Id.* That contract-harmonization principle – emphasized in *Gallo* as well. 813 F.3d at 270.

Next, Plaintiffs invoke the so-called "Cap Clause" language to support their claim for post-CBA vested benefits. This language that limited GE's liability for retiree benefits is found only in the 1991, 1994, 1997, 2000, and 2003 CBAs. Plaintiffs allege that certain language capped the amount of "GE's post-contract financial responsibility for its Retiree Benefit Plans after the CBC contract expired." ECF No. 1 at ¶ 27B. These Cap Clauses do not establish vesting for life for two reasons.

First, the "Cap Clause" did not address GE's "post-contract" responsibilities. Rather, it addressed limits to Defendant's financial obligations during the contract. In each PIA, the durational clause provided that the PIA would "continue in full force and effect" for an initial fixed term of three or four years, "*and from year to year thereafter*," "unless" either side notified the other during a specified period of "its intention to terminate th[e] Agreement" upon a certain date. *See* PIA (ECF No. 46-3) at PageID #: 648, Title IV, § 3 (emphasis added); ECF No. 1 at ¶ 67. Accordingly, the Cap Clause merely imposed a limitation on GE's contribution obligations

23

(4:15CV2301)

starting in January of the first year of any contract continuation after the initial fixed term.

Indeed, Plaintiffs admit that no Cap Clause was ever applied post-CBA termination.  Each of the

1991-2003 CBAs was terminated prior to its stated expiration date and new Cap Clauses were

negotiated.  ECF No. 50 at PageID #: 956; ECF No. 1 at ¶ 24.

Second, assuming *arguendo* that each Cap Clause would have continued to apply after

the applicable CBA ended, those clauses "simply [are] not . . . language that affirmatively

operate[d] to create the promise of vesting."  *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 135

(2d Cir. 1999).  Rather, those clauses limited GE's potential liability for "any subsequent

postretirement medical benefit[ ]" obligations that it might have had.  *See* 1991 PIA (ECF No.

46-8) at PageID #: 902, Title I, § 1(c).  *Cole*, 2017 WL 1404188, at *6 ("[T]he fact that [the

parties] anticipated, or even hoped, that these benefits would continue does not mean that [the

company] is bound to provide these benefits for the life of the retirees.").  Those clauses did not

themselves promise any post-CBA benefits to any retirees, and Plaintiffs have not identified any

other language so promising.  Thus, no such promise was made.  *See Joyce*, 171 F.3d at 135;

*Gallo*, 813 F.3d at 270 ("the written agreement is presumed to encompass the whole agreement

of the parties" (quoting *Tackett*, 135 S. Ct. at 936)).

Finally, Plaintiffs graft on to their claim for post-CBA benefits by invoking other

miscellaneous provisions in the Benefit Plans that are the principal focus of the Complaint (ECF

No. 1) – *i.e.*, the so-called "pension tying," "surviving spouse," lifetime maximum," and "enroll

at any time" provisions.  ECF No. 50 at PageID #: 948-49, 963-64.  None of these provisions is

sufficient to overcome the clear reservation of rights and durational provisions of the CBAs and

24

(4:15CV2301)

Benefit Plans to create vesting.  The presence of such provisions, while appropriate components

of any plan providing medical benefits during the term of a CBA, do not imply that benefits are

guaranteed to continue beyond the term of the CBAs, nor do they undermine GE's retained right

to amend or terminate the Plans at a later time.  Importantly, none of these provisions sets forth a

"specific time limit" that is different than the general durational clause of the CBAs.  *Gallo*, 813

F.3d at 271-72 ("*[A]bsent more specific limits* relevant to a particular term . . . in the retiree

healthcare provisions, the general durational clause controls."); *Cherry v. Auburn Gear, Inc.*, 441

F.3d 476, 483-84 (7th Cir. 2006) (holding that a surviving spouse provision is insufficient when

the CBA only obligates the employer to provide benefits for the duration of the contract).  Nor

have Plaintiffs demonstrated that the contracts were sufficiently ambiguous as to "overcome any

presumption that the general-duration clause should govern."  *Reese III*, 854 F.3d at 883 (citing

*Tackett III*, 811 F.3d at 208).

The Complaint (ECF No. 1) notes that, "in the event of a retiree's death, his or her

surviving spouse . . . is entitled to medical care benefits equal to the remaining balance, if any,"

under one of the Benefit Plans.  ECF No. 1 at ¶¶ 51, 27.C.2.  Plaintiffs cited *Fletcher v.*

*Honeywell Int'l, Inc.*, No. 3:16-cv-302, 2017 U.S. Dist. LEXIS 28324 (S.D. Ohio Feb. 28,

2017), during the April 17, 2017 Telephonic Status Conference in support of their position that

benefits for the retirees are for life.  In *Fletcher*, the court found "[t]he fact that Honeywell so

willingly agreed to provide lifetime healthcare benefits to surviving spouses and dependents . . .

detracts from the credibility of its claim that it never would have agreed to provide lifetime

healthcare benefits for the retirees themselves."  *Id.* at *20.  But courts have held that such

25

 (4:15CV2301)

surviving spouse benefits language "does not constitute affirmative language that could reasonably be interpreted as creating a promise to vest *the Retirees' benefits*." *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006) (emphasis added).  Such provisions "promise[ ] benefits to spouses of [retirees] who are participants at the time of their death," but do not promise to allow retirees to remain as participants until the time of their death. *Id.* at 62.  In other words, such provisions merely "refer[ ] to the eligibility of [surviving spouses] to receive benefits under the agreement, not to the *duration of the agreement*." *Cherry*, 441 F.3d at 483 (emphasis in original).  And those courts made this ruling even though the surviving spouses in those cases were promised "lifetime" benefits, *see id.*; *Bouboulis*, 442 F.3d at 62-63, whereas the surviving spouses in the case at bar were simply promised the retirees' "remaining balance[s]."

## B.  Breach of a Fiduciary Duty Claim

Plaintiffs also alleges that "GE's plan to terminate the Retiree Benefit Plans constitutes a breach of fiduciary duty in violation of ERISA Section 404, 29 U.S.C. § 1104."  ECF No. 1 at ¶ 94.  Plaintiff offers no opposition to Defendant's argument that it did not breach a fiduciary duty by replacing the benefit plans with an alternative set of post-65 health benefits.  *See* Memorandum in Support (ECF No. 46-1) at PageID #: 623.  As the Court of Appeals for the Sixth Circuit explained in *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660 (6th Cir. 1998),

> . . . courts have typically distinguished between employer actions that constitute "managing" or "administering" a plan and those that are said to constitute merely "business decisions" that have an effect on an ERISA plan; the former are deemed "fiduciary acts" while the latter are not.  It is firmly established, for example, that

26

(4:15CV2301)

> "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Sutter v. BASF Corp.*, 964 F.2d 556, 562 (6th Cir. 1992) (quoting *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990)); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("Employers or other plan sponsors are generally free under ERISA for any reason at any time, to adopt, modify, or terminate welfare plans.").

*Id.* at 665.  Because Plaintiffs failed to meet their burden in opposing dismissal on their breach of fiduciary duty claim, Plaintiffs have abandoned this claim and waived any argument concerning dismissal of such claim.  *Hicks v. Concorde Career Coll.*, 449 Fed.Appx. 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in . . . his response to the summary judgment motion"); *see also, e.g.*, *Rivers v. Turner*, No. 3:14 CV 2547, 2015 WL 5444838, at *7 (N.D. Ohio Sept. 15, 2015) (Zouhary, J.) (plaintiff waived any opposition to defendants' motion to dismiss his substantive due process and Eighth Amendment claims by failing to raise arguments in support of his claims in response to defendants' arguments); *Hadi v. State Farm Ins. Cos.*, 2:07-CV-0060, 2008 WL 4877766, at *13 (S.D. Ohio Nov. 12, 2008) (finding plaintiff's failure to respond with any evidence supporting his negligent infliction of emotional distress claim "apparently concedes that summary judgment is proper on this count.").  Therefore, Defendant's Motion to Dismiss (ECF No. 46) with respect to the breach of fiduciary duty claim is granted for the reasons articulated by Defendant.  *See* ECF No. 46-1 at PageID #: 623; Reply Memorandum (ECF No. 51) at PageID #: 1513.

(4:15CV2301)

## C.    Claim that Defendant's Change as of January 1, 2015 to the Structure of the Drug Plan and the Medicare A Plan was Unlawful

Finally, Plaintiff alleges that GE acted unlawfully when it unilaterally "transferred" the Drug Plan and the Medicare A Plan from the LDM Plan to a separate retiree-only plan as of January 1, 2015.  ECF No. 1 at ¶¶ 87 and 96.  According to Plaintiffs, the transfer violated the 2011 CBA because Defendant "agree[d] to accept" the 2011 LDM Plan and "agree[d] to the terms and conditions thereof to the extent applicable to the employees."  ECF No. 50 at PageID #: 965 (citing PIA (ECF No. 46-3) at PageID #: 636, Title I, § 4).

Defendant argues without opposition that this ancillary claim is moot if the Court dismisses Plaintiffs' primary claims challenging the termination of these post-65 Benefit Plans as of 2016.  ECF No. 46-1 at PageID #: 623; ECF No. 50 at PageID #: 965; ECF No. 51 at PageID #: 1512-13.  In any event, Plaintiffs have not identified any possible injury that would warrant monetary or equitable relief for this claim.  The restructuring did not affect substantive benefits.

## IV.  Conclusion

For the reasons set forth above and those that have been articulated in the memoranda of points and authorities on which Defendant relies in support of the motion, Defendant's Motion to Dismiss (ECF No. 46) is granted.


IT IS SO ORDERED.


  July 28, 2017                                        /s/ Benita Y. Pearson
Date                                              Benita Y. Pearson
                                                  United States District Judge

28